# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHWESTERN DIVISION

| | |
|---|---|
| JAMES BERRY, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 09-CV-00559-NKL |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff James Berry, Jr. ("Berry"), challenges the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and under Title XVI for supplemental security income.

Berry's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). After administrative hearings were held on March 25, 2008, June 24, 2008, and October 1, 2008, the ALJ found that Berry was not "disabled" as that term is defined in the Act. The Appeals Council denied Berry's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Berry argues that the record does not support the ALJ's finding that he was not under a disability because there was no substantial evidence to support the ALJ's finding at Step

1

Three of the sequential process that Berry did not have an impairment or combination of impairments listed in 20 C.F.R. Part 404, Subpart P. In particular, Berry argues that the ALJ improperly concluded that Berry's impairments meet or equal the severity impairments of listing 12.02 for organic mental disorders. Because this Court finds no reversible error in the ALJ's decision, Berry's Complaint [Doc. # 6] is denied.

**I.      Factual Background**

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, Berry was forty-four years old with a high school education. Berry's past work primarily included janitorial work, construction, plumbing, heating, electrical, pressman for newspaper and other temporary services. Berry alleges that he became disabled on or about June 21, 2003.

Berry claims he became disabled because of left elbow and back problems, memory loss, and left shoulder problems.

**A.      Medical Records**

In June 2003, Berry dislocated his left elbow during an assault and began seeing doctors at the Truman Medical Center Orthopedic Clinic (TMCOC). Berry was prescribed several narcotic painkillers and a non-steroidal anti-inflammatory medication. Throughout the next month, Berry's injury healed and his range of motion improved.

On July 25, 2003, Berry appeared unscheduled at TMCOC complaining of pain, and

---

[1] Portions of the parties' briefs are adopted without quotation designated.

was angry that he was being sent to physical therapy while he still needed pain control. The doctor contacted the pharmacy and learned that Berry had received 174 narcotic tablets in the previous 25 days. The doctor noted that Berry had a significant amount of narcotic use and clearly needed to be stepped down. However, the doctor provided him a prescription for Darvocet, a narcotic pain medication. Three days later, on July 26, Berry presented to the emergency room at St. Luke's complaining of left elbow pain. He requested pain medication and was given a prescription for Percocet, another narcotic pain medication.

On August 2, Berry returned to St. Luke's after an altercation with the police. Berry reported that he was taking both Percocet and Vicodin, but that the police took the medications. Berry requested more Percocet. On August 8, Berry presented to a clinic at Truman Medical Center (TMC) complaining of pain "everywhere" and hyperactivity. Berry was given a prescription for ibuprofen and referred to the Behavioral Health department.

In September, Berry returned to TMCOC complaining that he was working and felt a pop in his left elbow. The doctor noted that Berry's range of motion was quite limited but his motor and sensory function was intact. The doctor limited Berry from lifting over 10 pounds and told him to return in four months. The doctor also prescribed a narcotic painkiller but informed Berry he should not need a refill.

On October 5, Berry went to St. Luke's complaining he had re-injured his left elbow. Berry was given an arm sling and additional Percocet. Berry went back to St. Luke's on October 9, requesting additional Percocet, which doctors refused to dispense. On November 5, Berry went to a clinic at TMC complaining of pain in his left elbow. According to the

doctor, Berry was angry that his pain was not controlled and felt that he was not being followed properly. The doctor also noted that Berry's claim that he was beaten and robbed with poles in June was inconsistent with previous visits. Berry was again referred to psychiatry.

Berry returned to the TMC clinic in February 2004, complaining of low back pain and headaches. Berry's straight leg raising was negative and he was able to stand, lie on the examining table, and walk without any obvious discomfort. Berry reported that he saw a psychiatrist but forgot why he was there due to his memory loss, which he stated started after his June 2003 beating.

In March 2004, Berry reported to TMCOC that his limited range of motion in his elbow was affecting his ability to work. The doctor stated that Berry should undergo aggressive physical therapy and a tomography scan and return in one month to discuss possible surgery. At Berry's next visit to TMCOC in April, the doctor noted that Berry had missed all of his therapy appointments and was asking for narcotics. Berry was given a non-narcotic painkiller for use with physical therapy, and his referral to physical therapy was renewed. The doctor noted that he had not ruled out surgery, but stated that because Berry was "not going to comply with our requests, surgical intervention on him might be futile." (Tr. 268). The doctor also expressed his concern that Berry had "some secondary gain issues, especially regarding prolonged narcotic usage or prolonged drawing of disability." (Tr. 268).

In May 2005, Berry complained of constant low back pain at the TMC clinic. The doctor noted that Berry's elbow and back pain complaints continued despite extensive pain

medicine usage, and that he had also obtained narcotics from outside dental clinics for tooth pain. Berry was instructed to continue with anti-inflammatories and therapy.

Later that month, Berry returned to TMCOC. The doctor noted that Berry had been a difficult patient, insisting on narcotics and disability treatment. The doctor noted that Berry's range of motion had improved through physical therapy, extended his therapy for six weeks, and noted that he believed Berry was making good progress and should continue to do so. In June, a TMCOC doctor determined that Berry had reached the best possible result and that TMCOC would discontinue his care. In June, Berry went to the TMC clinic requesting a physical so that he could get a job. Berry stated that his elbow and back pain were controlled with anti-inflammatories and a muscle relaxer. Berry's examination was unremarkable, and his mood and affect were normal.

In September 2005, while in the Jackson County Jail, Berry saw a nurse for headaches and left shoulder pain. Berry did not mention elbow or back pain. The nurse noted that there was no objective evidence of functional limitations related to Berry's pain complaints.

In May 2006, Berry went to the TMC clinic requesting a physical examination because he was seeking employment. Berry reported headaches associated with his left shoulder pain, elbow pain, and memory loss. The doctor noted that a July 2005 x-ray of Berry's elbow revealed degenerative changes, but no significant changes from a previous x-ray. The doctor referred Berry back to the TMCOC.

In July 2006, Berry underwent a consultative examination with Alan Israel, Ph.D., in connection with his application for Medicaid. Dr. Israel administered the Wechsler Adult

5

Intelligence Scale-III (WAIS-III), which showed that Berry had a verbal IQ score of 70, a performance IQ score of 63, and a full scale IQ score of 64. Dr. Israel diagnosed Berry with a cognitive disorder and borderline intellectual functioning. In connection with his applications for benefits, Berry also submitted educational records. In 1972, Berry was given an IQ test which showed a verbal IQ of 90, a non-verbal IQ of 81 and an average IQ of 86.

In December 2006, Berry saw Dr. Israel again in connection with his disability applications. Dr. Israel noted that Berry seemed evasive at times. Berry identified his problems were his ribs hurting, pains in his groin, forgetfulness, anxiety and depression. Dr. Israel again diagnosed Berry with a cognitive disorder and borderline intellectual functioning.

In January 2007, Berry presented to the Headache and Pain Center complaining of pain all over his body. Berry reported that his pain first occurred when he was in accidents in October and November of 2006, and early January of 2007. Berry reported memory loss, but the doctor noted that Berry's immediate, recent, and remote memory seemed normal. Berry had normal orientation, memory, attention span and concentration, language, and fund of knowledge. The doctor also noted that Berry's neck, back, and limbs had normal muscle strength, tone, and stability. Berry reported pain in his ribs, a very recent x-ray of his ribs, and the examination revealed tenderness over his ribs. The doctor diagnosed chest wall pain and gave Berry an injection in his ribs.

In June 2007, Berry followed up at the TMC clinic for pain complaints and memory loss. The doctor noted the range of motion limitations in Berry's arm, but stated that his

range of motion was normal in his other limbs, and his muscle strength was good in all limbs. Berry was prescribed a muscle relaxer and an anti-inflammatory and referred to TMCOC. A magnetic resonance imaging of Berry's brain revealed no acute abnormality that would explain his alleged memory loss.

Berry reported to TMCOC for his left elbow and left shoulder in July 2007. The doctor indicated that Berry's elbow had never fully healed due to his non-compliance with physical therapy. The doctor noted that Berry's left shoulder x-ray showed calcification. The doctor noted that there was no orthopedic intervention to be offered, but that Berry should return to physical therapy. The doctor noted that Berry would need to obtain a physical therapy referral, pain medications, and any disability-related paperwork from his primary care physician.

In July 2007, Berry reported to Truman Medical Center Behavioral Health (BH) on a psychiatry referral. The treatment notes stated that Berry's TMC doctor had referred him to BH on May 2006 for memory loss. Berry did not complain of day-in day-out issues with memory, and the notes indicate that Berry appeared to want "this issue to net him SSI benefits." (Tr. 517). Berry repeatedly demanded that BH provide him cash and pain medications.

Berry had a formal intake interview with a BH clinician in August 2007. Berry's memory was within normal limits, and the clinician noted that he sometimes appeared to have difficulty following conversation and understanding questions, but it was difficult to determine if he was intentionally avoiding questions or had a genuine problem. The clinician

7

indicated that it was possible that Berry was seeking treatment with the intent of obtaining social security benefits and described Berry as having a lack of motivation. Berry's preliminary diagnosis was mood disorder.

In September 2007, Berry went to TMC clinic seeking a work release. Berry reported that he was able to perform his current work and that he had driven a cab without problems, cared for himself and had good recall without functional problems currently regarding his memory impairment.

In December, Berry had an initial psychiatric evaluation. Berry reported difficulty sleeping, worry, and poor concentration, which he attributed to an accident at work. The doctor noted that Berry's immediate, recent and remote memory were all intact. Berry had no delusions, hallucinations, or other abnormal thought content. The doctor found that employment was the source of Berry's stress, and referred him to vocational rehabilitation. On the referral paperwork, the doctor noted Berry's mood disorder, but did not list any symptoms that would impair functioning.

At a January 16, 2008, BH appointment, the doctor noted that Berry's attention and concentration were intact and his thought process was logical and goal directed. Berry asked for and was prescribed anti-depressant medication. On January 30, the doctor noted that Berry reported a depressed mood, but was vague with details and focused on financial assistance. Berry showed no indication of psychosis or mania. In March, the doctor again indicated that Berry's attention and concentration were intact and his thought process was logical and goal directed.

8

In April 2008, Berry reported that his memory loss had caused him to recently lose his job. Berry complained of pain in his shoulder and was given Percocet. In May 2008, Berry returned to the TMC clinic complaining of pain. The doctor noted that Berry's physical examination was not quite consistent with his complaints.

After Berry's last administrative hearing, Berry had another consultative examination with Dr. Israel on November 29, 2008. Dr. Israel administered the WAIS-III again, which showed a verbal IQ score of 67, a performance IQ score of 58, and a full scale IQ score of 61. Dr. Israel administered the Test of Memory Malingering (TOMM), which suggested that Berry had difficulty with concentration. Dr. Israel felt that the TOMM results suggested that Berry's IQ scores were accurate. Dr. Israel diagnosed Berry with a pain disorder and mild mental retardation. He noted, however, that Berry would be able to manage his own funds.

**A.     Berry's Testimony**

At the first administrative hearing, Berry testified that he was 44 years old, completed the twelfth grade in school, and that he was in special education. He testified that he was currently working part-time doing janitorial work. Berry arrived with a cane, which he said was due to his shoulder being dislocated. Berry was also wearing a sling because of his shoulder pain.

Berry stated that he had experienced memory problems since the late 1990s. However, he testified that he had had head injuries in life with the last one being a fight with some guys with "poles," which resulted in his dislocated elbow. He testified that he had been in car wrecks and in a bicycle accident. With regard to his memory, Berry testified that he

9

forgets things, such as his wallet and gloves. Berry testified that he forgets about doctor appointments and has difficulty following directions on the job. Berry stated that he had symptoms of depression and cried a lot. Berry explained that he did not like socializing with people and that he has problems with his temper at work. Berry stated that he had lost his last job at a nursing home because of his legs and back.

### C. Medical Expert Testimony

At the October 2008, supplemental hearing, Nancy Winfrey, M.D., testified as a medical expert. Dr. Winfrey noted that Berry did not show intellectual deficits early on and did not show adaptive functioning deficits, and other parts of the record do not show the deficits in memory that Berry alleged. She pointed out that one of Berry's health providers explicitly remarked that it was possible that Berry was only seeking treatment to obtain disability benefits. She opined that, based on the evidence in the record, the IQ scores obtained by Dr. Israel were not valid.

### B. The Vocational Expert's Testimony

Barbara Meyers testified as the vocational expert at the supplemental hearing. The ALJ asked her to assume a hypothetical individual of Berry's age, education, and experience who was limited to light work, was limited to nominal and occasional use of his left arm, could lift 20 pounds with his dominant right arm, could not climb ladders, ropes, or scaffolds, and could not crawl. The individual was limited to simple, unskilled work, could not work with the public, and could have only occasional interaction with co-workers or supervisors. The vocational expert testified that such an individual could perform the jobs of a photocopy

machine operator, collator machine operator, or folding machine operator and that there were significant jobs in the national economy.

## II. The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

> The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that Berry was not disabled. At step one, he determined that Berry was not engaging in substantial gainful activity since June 21, 2003.

At step two, the ALJ determined Berry was severely impaired by a left elbow disorder, status post dislocation with some residual pain and limitation of motion; chronic left shoulder pain; a cognitive disorder, not otherwise specified, of undetermined etiology; borderline intellectual functioning with conflicting IQ scores of questionable validity; and depression/a mood disorder and a history of substance abuse.

At step three, the ALJ determined that Berry did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

At step four, the ALJ considered the medical records and other evidence and found that Berry has the residual functional capacity to perform light work.

11

At the fifth step, the ALJ considered the testimony of the VE, determining that under Berry's residual functional capacity he would be able to perform work as a photocopy operator or collator and folding machine operator which exists in significant numbers in the national economy. Therefore, the ALJ found that Berry was not disabled.

## III. Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

Berry argues that the ALJ erred because there was no substantial evidence to support the ALJ's finding at Step Three of the sequential process that Berry did not have an impairment or combination of impairments listed in 20 C.F.R. Part 404, Subpart P. This Court finds no reversible error in the ALJ's decision.

Berry contends that he meets Listing § 12.02 for organic mental disorders. Berry argues that he meets this listing because he has (1) psychological or behavioral abnormalities associated with a dysfunction of the brain; (2) IQ tests that show a loss of measured intellectual ability of at least 15 points; (3) marked deficits in maintaining social functioning; and (4) marked deficits in maintaining concentration, persistence, and pace.

Under Listing § 12.02 the following must be satisfied: "History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." Next, the required level for severity of this disorder is met when the requirements in both subsection A and B are met. Under subsection A, Berry claims that he has a loss of measured intellectual ability of at least 15 IQ points. Under subsection B, Berry claims that he has marked deficits in maintaining social functioning and marked deficits in maintaining concentration, persistence and pace.

The ALJ properly determined that the evidence in the record does not support a finding that Berry suffered an organic brain dysfunction. None of the evidence indicates that Berry had a serious head injury, as he has repeatedly claimed. At the first supplemental

13

hearing, the ALJ asked counsel for Berry: "12.02 requires history and physical examination or laboratory tests which demonstrate the presence of a specific organic factor judged to be logically related to the abnormal mental state. Do we have any evidence of that?" (Tr. 43). Counsel for Berry responded that "[t]here has been no MRI or CAT Scan that I'm aware of, no." Counsel for Berry referred the ALJ to Berry's IQ tests. However, when asked whether there was evidence in the record of "physical examination or laboratory tests which the presence of a specific organic factor judged to be related to the abnormal state[,]" counsel for Berry responded that he was not aware of any such evidence. The ALJ noted that Berry tied his memory loss to a head injury in 2003, yet the record did not show a serious head injury in 2003. The ALJ noted that a 2003 CT of Berry's head was normal, and a 2007 MRI of Berry's brain was also normal. Accordingly, the ALJ properly determined that Berry failed to meet the threshold requirement of demonstrating a specific organic factor judged to be etiologically related to the abnormal mental state.

Even if Berry satisfied this threshold requirement, the ALJ properly determined that, based upon the record as a whole, Berry's IQ scores were inconsistent. The ALJ noted the numerous visits to BH in which Berry's mental status examinations were normal. The ALJ also discussed Dr. Winfrey's testimony, in which she indicated that Berry's reports about his memory were inconsistent and that based on all the evidence of record, she did not believe that the IQ scores Dr. Israel found were valid. The ALJ concluded that the IQ scores indicative of mental retardation were not valid and were not consistent with the other evidence that showed that Berry did have the ability to function and had demonstrated no

14

deficiencies in adaptive functioning.

Berry asserts that the ALJ's disagreement with Dr. Israel is a "highly unusual spectacle" because Dr. Israel was an expert paid for by the Commissioner. Contrary to Berry's argument, however, the Eighth Circuit has held that "[m]edical experts retained by the government should not act as advocates, but rather as sources of objective information." *Bentley v. Shalala*, 52 F.3d 784, 786-87 (8th Cir. 1995). The ALJ may reject the opinion of any medical expert, regardless of who hired the expert, if the opinion is inconsistent with the medical record as a whole. *Id.* at 787.

Berry contends that there is no medical evidence in the record that refutes Dr. Israel's IQ findings and that the ALJ should not have relied on Dr. Winfrey's opinion because she did not examine Berry. However, The ALJ is not required to accept Berry's IQ scores, "and may reject scores that are inconsistent with the record." *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (quoting *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)). The Eighth Circuit explained that the ALJ should examine IQ test results "to assure consistency with [plaintiff's] daily activities and behavior." *Id.* (quoting *Clark*, 141 F.3d at 1255).

The record contains evidence that conflicts with Dr. Israel's opinion, and supports the ALJ's decision to discredit the scores. *See Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995) (holding that when one-time examining physicians dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions). Here, Berry's own treating psychiatrists expressed no concern about his intellectual functioning. At his initial intake interview, the doctor noted that Berry's immediate, recent and remote memory were

all intact, and that he had no delusions, hallucinations, or other abnormal thought content. At his next two appointments, the doctor noted that his attention and concentration were intact and his thought process was logical and goal directed. Moreover, there are numerous instances in which Berry's treating physicians questioned his motivation.

The ALJ appropriately gave more weight to Berry's treating psychiatrists than to Dr. Israel, who was a consultative examiner. As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician. *See Cantrell v. Apfel*, 231 F.3d 1104, 1007 (8th Cir. 2000). Even Dr. Israel, despite his ultimate conclusion, described Berry as evasive. Dr. Israel also noted Berry's inconsistent stories to various health providers. The ALJ properly determined that Dr. Israel's conclusions, including Berry's IQ scores, were inconsistent with the record. "Physician opinions that are internally inconsistent [] are entitled to less deference than they would receive in the absence of inconsistencies." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005).

Berry also contends that the ALJ should not have relied on Dr. Winfrey's opinion because she was a non-examining source. It is true that the opinion of a reviewing physician alone does not constitute substantial evidence. *See Brock v. Sec'y of Health & Human Servs.*, 791 F.2d 112, 114 (8th Cir. 1986). However, in this case, the ALJ did not rely solely on the reviewing physicians. The ALJ also conducted an independent analysis of the medical evidence. *See Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). Agency regulations

indicate that although the ALJ is not bound by the findings of the medical consultants, "these findings are considered at the hearing level." 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2). The ALJ properly evaluated Berry's IQ scores in light of all the record evidence. The ALJ resolved the inconsistencies in the record, and his decision is supported by substantial evidence. Accordingly, the ALJ properly determined that Berry was not disabled.

## V. Conclusion

Because this Court finds no reversible error in the ALJ's decision, Berry's Complaint [Doc. # 6] is DENIED.

                                                s/ NANETTE K. LAUGHREY
                                                NANETTE K. LAUGHREY
                                                United States District Judge

Dated: May 14, 2010
Jefferson City, Missouri